**Affirm and Opinion Filed July 20, 2022**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-21-00461-CR

### BRANDON RAY WILLIAMS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-80500-2019**

## MEMORANDUM OPINION

Before Justices Myers, Carlyle, and Goldstein
Opinion by Justice Myers

A jury convicted appellant Brandon Ray Williams of criminally negligent homicide and assessed punishment at two years' confinement in state jail. Appellant raises two issues, challenging the sufficiency of the evidence and arguing he should have been charged under a different statute. We affirm.

### DISCUSSION

### 1. Sufficiency of the Evidence

In his first issue, appellant argues the evidence is insufficient to support a finding of guilt for the offense of criminally negligent homicide.

When determining whether the evidence is sufficient to support a conviction,

we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a factfinder could have found the essential elements of the charged offense were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). The factfinder must resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (citing *Jackson*, 443 U.S. at 319). We presume the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also defer to the factfinder's evaluation of the credibility and weight of the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). This standard is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

A person commits criminally negligent homicide if he or she "causes the death of an individual by criminal negligence." TEX. PENAL CODE § 19.05(a). The offense is a state jail felony. *Id*. § 19.05(b). A legally sufficient showing of criminally negligent homicide requires the State to prove that (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that the conduct created a substantial and unjustifiable risk of death; and (3) his failure to perceive the risk constituted a gross deviation from the standard of care an

ordinary person would have exercised under similar circumstances. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (citing TEX. PENAL CODE §§ 6.03(d), 19.05(a)). The circumstances must be viewed from the standpoint of the defendant at the time the allegedly negligent act occurred. *Id*. at 623.

Criminal negligence is not simply the criminalization of ordinary civil negligence. *Id*. The conduct "that constitutes criminal negligence involves a greater risk of harm to others, without any compensating social utility than does simple negligence," and "[t]he carelessness required for criminal negligence is significantly higher than that for civil negligence." *Id*. (quoting *Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012)). For conduct to constitute criminal negligence, it "must be 'egregious' and there must be some 'serious blameworthiness' attached to the conduct." *Harber v. State*, 594 S.W.3d 438, 448 (Tex. App.—San Antonio 2019, pet. ref'd) (quoting *Queeman*, 520 S.W.3d at 629, 630); *see Thedford v. State*, No. 05-18-00884-CR, 2020 WL 5087779, at *6 (Tex. App.—Dallas Aug. 28, 2020, pet. ref'd) (mem. op., not designated for publication). The risk created by the conduct must be "substantial and unjustifiable," and we determine whether the conduct involves such an extreme degree of risk by examining the conduct itself, not the resultant harm. *Queeman*, 520 S.W.3d at 623. Furthermore, the defendant's "failure to perceive [the risk] must be a 'gross deviation' from reasonable care as judged by general societal standards by ordinary people." *Id*. (quoting *Montgomery*, 369 S.W.3d at 193).

The evidence in this case shows that on the afternoon of November 17, 2017, at around 3 p.m., Melissa Stolhand was driving westbound on Farm to Market Road 6, a two-lane highway in Josephine, Texas. It was a sunny afternoon and there was no rain. Stolhand was driving a couple of car lengths behind a Ford Ranger driven by the eighty-seven-year-old complainant-decedent, Harold Smith. They were approaching a curve in the road. A Ford F-150 driven by appellant approached from the other direction, traveling eastbound. The F-150 crossed over into the westbound lane of traffic and both Smith and Stolhand took evasive action into the eastbound lane to avoid him. Stolhand testified that appellant's vehicle did not use its blinker and did not appear to be turning at an upcoming intersection but continued going further off the road. Appellant's vehicle was, Stolhand recalled, all the way over to the side of the road in the westbound lane—part of his wheels touching the grass— before he overcorrected "all the way" back into his original eastbound lane, where he hit Smith's Ford Ranger head-on. Stolhand testified that appellant's swerve "was very dramatic" and there was "no time to get back over into the other side" of the road. After the collision, the two vehicles slid farther down the road. Stolhand dodged the collision and debris and then called 911 seconds after she pulled over to the side of the road. Smith died of his injuries while on his way to the hospital.

Chief Matthew Briggs of the Josephine Police Department, who reviewed the "black box" data report from appellant's vehicle, testified that appellant had been driving about 47 miles per hour before slowing to 40 miles per hour at the time of

the crash, braking a half-second before impact. Briggs testified that police dispatch received the 911 call at 3:12 p.m. Briggs also testified that appellant "essentially" admitted responsibility for the crash:

Q. [STATE:] Did you ask him what happened?

A. I did.

Q. And what was his response to that?

A. [Appellant] told me initially that he was trying to turn onto Sebastian and that he would have mistakenly drifted into the lane of oncoming traffic, overcorrected, and then ran into the other vehicle causing the accident.

Q. Essentially admitting that he was responsible for the one responsible for this?

A. I believed that to be the case, yes.

Shelby Alford, a junior in high school who had just left the Josephine market, testified that she was about a quarter of a mile away from the collision. She heard the crash and went over to the scene to see if she could help. She described Smith as an older man and testified that she saw him stuck in his vehicle, "slumped over," unconscious, with blood running down his forehead. Alford then talked to appellant, who told her he was fine and to check on Smith. Alford noticed that Smith was "kind of moving around," and that other people were tending to him, so she went back to talk to appellant. According to Alford, appellant told her that he was texting and driving and was not paying attention at the time:

Q. [STATE:] How does that play out?

A. [ALFORD:] Brandon, he was a nervous wreck. I was like, it's okay, calm down. What happened? What caused—you know, I'm asking him what caused the accident, and he tells me that he was texting and driving and wasn't paying attention at the time.

Q. What's—what was his demeanor like?

A. Very—he was nerve—wreck—like, he was all over the place. Felt—you could tell he felt horrible for everything.

Q. And did he seem like he was mad at himself?

A. Yeah.

Q. Did he also tell you about kind of how it played out, about the cars going in different lanes and things like that?

A. No. He just told me that he glanced down at his phone from texting and next thing he knows it was too late.

Alford recalled that, at the crash scene, she told the police chief that she did not speak with appellant. She did not tell him about appellant's admission until a few weeks or perhaps a month later, when Alford gave the police a written and recorded statement. She testified that she had hesitated "[b]ecause there was so much going on at the crash scene," and she "didn't want to get in the way."

Jonathan Johnson, a former detective who had handled digital forensics for about ten years, analyzed the contents of appellant's phone after Cellebrite software unlocked it. Johnson testified that he had performed "almost" one thousand phone extractions (he said it would be impossible to provide a precise number), and he walked the jury through his analysis of appellant's phone extraction. Appellant's phone picked up movement that it categorized as "steps" during the time the text was read, but Johnson testified that these "steps" could have been triggered by a

phone inside a vehicle driving over something like speed bumps "quite a few times." Johnson testified there was a very high probability the movement detected was not actually someone taking steps. Johnson also pointed out that the Cellebrite software used to unlock the phone later changed how it reported movement, reporting only steps per hour.

The evidence from the unlocking of appellant's phone showed that, on the day of the crash, he received a text message at 3:10:55 p.m. saying, "[W]orking late?" It was read a few seconds later, at 3:11:07 p.m. That text was read just before the first 911 call, which was at 3:12:51 p.m.

When law enforcement questioned him at the scene of the crash, appellant initially denied drinking any alcohol that day, but later admitted he had had a couple of drinks during lunch, at around 1 o'clock that day. Law enforcement officers found empty beer cans on the ground around appellant's truck that were cold to the touch. They found an open cooler in the back of appellant's truck, the inside of which was also cold to the touch. Officers conducted standardized field sobriety testing on appellant at the crash scene; they did not find sufficient signs of intoxication to arrest appellant for intoxication.

The indictment alleged the following manners and means by which appellant committed criminally negligent homicide: (1) he failed to maintain a single lane; (2) operated a motor vehicle on the wrong side of a divided highway; (3) failed to control the motor vehicle; (4) failed to timely apply brakes; (5) failed to keep a

proper lookout for another motor vehicle; (6) used a portable wireless communication device to read, write, or send an electronic message while operating a motor vehicle; and (7) operated a motor vehicle after introduction of alcohol into the body. The application paragraph in the jury charge included the driving conduct alleged in the indictment.[1]

When the charge authorized the jury to convict on more than one theory, as it did here, the verdict of guilt will be upheld if the evidence is sufficient on any of the theories. *See Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007); *Frazier v. State*, No. 03-19-00024-CR, 2021 WL 81871, at *7 n.6 (Tex. App.—Austin Jan. 8, 2021, pet. ref'd) (mem. op., not designated for publication).

The evidence in this case shows appellant caused Smith's death. Chief Briggs testified that appellant "essentially" admitted that he was responsible for the accident. The evidence also shows that appellant received a text message on his cell phone just before the crash; his vehicle drifted into the oncoming lane of traffic on a two-lane highway without signaling; his vehicle's tires touched the grass on the other side of the road; and then his vehicle swerved dramatically back into its original lane, hitting Smith's vehicle head-on. The injuries Smith sustained in the collision caused his death. Appellant admitted to Alford that he was texting and driving, telling her he glanced down at his phone when he was texting and that the

---

[1] The charge also included a special issue on appellant's use or exhibition of a deadly weapon during the offense, but the jury did not find appellant used or exhibited a deadly weapon.

next thing he knew, "it was too late." Furthermore, based on the evidence, a rational factfinder could have reasonably concluded appellant ought to have been aware of the substantial and unjustifiable risks created by his conduct and that his failure to perceive those risks constituted a gross deviation from the ordinary standard of care. *See, e.g.*, *Montgomery v. State*, 369 S.W.3d 188, 194-95 (Tex. Crim. App. 2012) (defendant who caused a collision of three vehicles had missed entrance ramp for highway because she was distracted by talking on her cell phone, yet she still attempted to move to the left lane, cut across a safety barrier, and get onto the entrance ramp); *Lopez v. State*, 630 S.W.2d 936, 941 (Tex. Crim. App. 1982) (defendant exceeded speed limit, ran red light on city thoroughfare at 11:30 p.m., and struck car backing out of parking lot, killing one of its passengers).[2]

Appellant's arguments are unpersuasive. He complains, for example, that the evidence presented here is insufficient because "[n]o reasonable person would have the prescience to perceive, and certainly would have no actual knowledge, that the other driver would take evasive action into the on-coming lane at exactly the same moment." But Stolhand testified that appellant appeared to realize he was on the wrong side of the road and then swerved back to his original lane after she and Smith

---

[2] Additionally, we note that the circumstances here are unlike those in *Queeman*, where the Court of Criminal Appeals found that, without more, Queeman's failure to maintain a safe speed and proper distance did not rise to the level of a gross deviation from the ordinary standard of care. *See Queeman*, 520 S.W.3d at 630. The court noted that there was nothing in the record to show Queeman was engaged in acts that might be characterized as grossly negligent in the context of his failure to control speed and failure to maintain a safe distance, such as talking on a cell phone, texting, or intoxication. *See id*.

–9–

switched lanes to avoid hitting him. The record does not support the suggestion that appellant and Smith "simultaneously" attempted to avoid the collision. Appellant also suggests the evidence "established" that he was attempting to turn left, and that "[n]o reasonable person could have imagined that there was a risk of death in turning left into a neighborhood." Yet while Stolhand acknowledged that she did not know if appellant intended to turn left, the State did not allege turning left as one of the criminally negligent actions. Moreover, there is ample evidence from which the jury could conclude that the manner in which appellant operated his vehicle—e.g., driving on the wrong side of a two-lane divided highway—constituted a gross deviation from the ordinary standard of care.

Appellant's remaining arguments concern the jury's evaluation of the credibility of the witnesses and the weight of the evidence. He argues that Alford was not a credible witness because she was not involved in the crash; appellant had a hands-free Ford Sync system in his truck; the cell phone extraction data shows he took "steps" during the time the text message was read; law enforcement agreed alcohol had no impact on the crash; the investigation into the crash was minimal; and the jury struggled with the proof offered at trial.

But none of these arguments undermine the sufficiency of the evidence supporting the verdict. First, regarding Alford, appellant does not explain how arriving at the scene after the crash and not telling law enforcement about appellant's admission until later on rendered her testimony unbelievable. Alford explained to

the jury why she did not tell the police chief about appellant's admission at the crash scene, and it was for the jury to assess her credibility as a witness and decide whether to accept or reject her testimony.

Second, as for whether appellant's truck had a Ford Sync system, when asked if appellant's truck was equipped with such a system, the defense's expert witness answered, "Yes, as far as I know." The defense's expert admitted, however, he had no other information or evidence to prove appellant had a Ford Sync or was using one. And the jury was free to weigh this testimony and accept or reject the defense's assertion that appellant was using a hands-free device to read text messages.

Third, the State's digital forensic expert testified that the movements detected by appellant's phone, i.e., the "steps," were based on phone movement and could have been triggered by a phone inside a vehicle driving over something like speed bumps quite a few times.

Fourth, insofar as alcohol having no impact on the crash is concerned, the testimony showed that officers, after conducting field sobriety testing, did not find sufficient signs of intoxication to arrest appellant for intoxication. However, officers found empty beer cans that were cold the touch at the crash scene, and a cold cooler in the back of appellant's truck. Also, appellant admitted he had a couple of drinks during lunch that day. The State did not have to prove appellant was intoxicated at the time of the crash, only that he acted with criminal negligence.

Fifth, appellant's complaints about the alleged inadequacy of the crash

investigation are centered on no data recording device having been removed from the vehicles, and that there was no complete accident reconstruction report. But a data recording device of some kind, i.e., a "black box," was removed from appellant's truck, and there was a data report. The jury was aware of the defense's contention that there was no accident reconstruction report because the defense's expert talked about that during his testimony, and the jury was free to consider this testimony along with the other evidence.

Finally, appellant's argument that the jury struggled with the burden of proof is apparently based on the jury having sent a note to the court during deliberations asking if appellant could be tried on a lesser offense or misdemeanor if he was found not guilty. The record shows that the jury sent two notes during deliberations. The first note asked for a definition of gross negligence, and the second note asked, "If found not guilty, can defendant be retried for lesser offense or misdemeanor or does he walk scot-free?" The trial court told the jurors they "have all the law and the evidence in this case. Please continue deliberations." Defense counsel was given an opportunity to object to this instruction but declined.

Given the evidence in this record, we conclude there was sufficient evidence for the jury to convict appellant of criminally negligent homicide as charged in the indictment. We overrule appellant's first issue.

## 2. *In Pari Materia*

In his second issue, appellant argues he should have been charged under

section 545.4251 of the Texas Transportation Code with the use of a portable wireless communication device because, according to appellant, the use of a portable wireless communication device statute and criminally negligent homicide are in pari materia, and the two statutes have an "irreconcilable conflict."

Appellant, however, did not request any relief from the trial court either through a motion to quash the indictment, a motion for directed verdict, or a motion for new trial on the grounds that section 545.4251 of the transportation code and section 19.05(a) of the penal code were in pari materia, and that he should have been charged under article section 545.4251. *See Azeez v. State*, 248 S.W.3d 182, 193 (Tex. Crim. App. 2008) (in para materia argument can be preserved through motion to quash, if error is apparent on face of charging instrument, or through motion for directed verdict or motion for new trial); *see also Haley v. State*, No. 05-11-01297-CR, 2013 WL 222275, at *5 (Tex. App.—Dallas Jan. 14, 2013, pet. ref'd) (not designated for publication); *Davoust v. State*, No. 05-10-00250-CR, 2011 WL 2090260, at *2 (Tex. App.—Dallas May 27, 2011, no pet.) (not designated for publication). Thus, appellant waived any claim on appeal that the statutes were in pari materia and that he was charged under the wrong statute. *See* TEX. R. APP. P. 33.1(a)(1). Furthermore, even if we considered appellant's argument, the statute he is relying on expressly provides for prosecution under other statutes: "If conduct constituting an offense under this section also constitutes an offense under any other law, the person may be prosecuted under this section, the other law, or both." TEX.

–13–

TRANSP. CODE § 545.4251(g); *see Jones v. State*, 396 S.W.3d 558, 563 (Tex. Crim. App. 2013) (subsection of statute stating that "[i]f conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section, the other law, or both," was "the most authoritative proof that the Legislature did not intend to limit the State to prosecution" under a particular statute).  We overrule appellant's second issue.

We affirm the trial court's judgment.


/Lana Myers//
LANA MYERS
JUSTICE

210461f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

BRANDON RAY WILLIAMS,
Appellant

No. 05-21-00461-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 416th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 416-80500-
2019.
Opinion delivered by Justice Myers.
Justices Carlyle and Goldstein
participating.

Based on the Court's opinion of this date, the judgment of the trial court is

**AFFIRMED**.

Judgment entered this 20th day of July, 2022.